ATTACHMENT A

To Plaintiffs' Opposition to Defendants' Motion to Dismiss

Case No. 1:05CV01579 (RBW)

Federal Register/Vol. 68, No. 10/Wednesday, January 15, 2003/Proposed Rules    1991

§ 1794.51   Preparation for scoping.

(a) As soon as practicable after RUS and the applicant have developed a schedule for the environmental review process, RUS shall have its notice of intent to prepare an EA or EIS and schedule scoping meetings (§ 1794.13) published in the **Federal Register** (see 40 CFR 1508.22). The applicant shall have published, in a timely manner, a notice similar to RUS' notice.

\*   \*   \*   \*   \*

14. Section 1794.52(d) is amended by removing the last sentence and adding a new sentence at the end of the paragraph to read as follows:

§ 1794.52   Scoping meetings.

\*   \*   \*   \*   \*

(d) \* \* \* The applicant or its consultant shall prepare a record of the scoping meeting. The record shall consist of a transcript when a traditional meeting format is used or a summary report when an open house format is used.

\*   \*   \*   \*   \*

15. Section 1794.53 is revised to read as follows:

§ 1794.53   Environmental report.

(a) After scoping procedures have been completed, RUS shall require the applicant to develop and submit an ER. The ER shall be prepared under the supervision and guidance of RUS staff and RUS shall evaluate and be responsible for the accuracy of all information contained therein.

(b) The applicant's ER will normally serve as the RUS EA. After RUS has reviewed and found the ER to be satisfactory, the applicant shall provide RUS with a sufficient number of copies of the ER to satisfy the RUS distribution plan.

(c) The ER shall include a summary of the construction and operation monitoring and mitigation measures for the proposed action. These measures may be revised as appropriate in response to comments and other information, and shall be incorporated by summary or reference into the FONSI.

16. Section 1794.54 is revised to read as follows:

§ 1794.54   Agency determination.

Following the scoping process and the development of a satisfactory ER by the applicant or its consultant that will serve as the agency's EA, RUS shall determine whether the proposed action is a major Federal action significantly affecting the quality of the human environment. If RUS determines the action is significant, RUS will continue with the procedures in subpart G of this part. If RUS determines the action is not significant, RUS will proceed in accordance with §§ 1794.42 through 1794.44, except that RUS shall have a notice published in the **Federal Register** that announces the availability of the EA and FONSI.

§ 1794.61   [Amended]

17. Section 1794.61 is amended by:
A. Removing paragraph (b).
B. Redesignating paragraph (a) as the introductory text; paragraph (a)(1) as (a); paragraph (a)(2) as (b); and paragraph (a)(3) as (c).

Dated: December 24, 2002.

**Blaine D. Stockton,**

*Acting Administrator, Rural Utilities Service.*

[FR Doc. 03–713 Filed 1–14–03; 8:45 am]

**BILLING CODE 3410–15–P**

---

**DEPARTMENT OF DEFENSE**

**Department of the Army, Corps of Engineers**

**33 CFR Part 328**

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 110, 112, 116, 117, 122, 230, 232, 300, and 401**

[FRL–7439–8]

RIN 2040–AB74

**Advance Notice of Proposed Rulemaking on the Clean Water Act Regulatory Definition of "Waters of the United States"**

**AGENCIES:** U.S. Army Corps of Engineers, Department of the Army, DOD; and Environmental Protection Agency.

**ACTION:** Advance notice of proposed rulemaking.

---

**SUMMARY:** The U.S. Army Corps of Engineers (Corps) and the Environmental Protection Agency (EPA) are today issuing an advance notice of proposed rulemaking (ANPRM) in order to obtain early comment on issues associated with the scope of waters that are subject to the Clean Water Act (CWA), in light of the U.S. Supreme Court decision in *Solid Waste Agency of Northern Cook County* v. *U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) *(SWANCC)*.

Today's ANPRM requests public input on issues associated with the definition of "waters of the United States" and also solicits information or data from the general public, the scientific community, and Federal and State resource agencies on the implications of the *SWANCC* decision for jurisdictional decisions under the CWA. The goal of the agencies is to develop proposed regulations that will further the public interest by clarifying what waters are subject to CWA jurisdiction and affording full protection to these waters through an appropriate focus of Federal and State resources consistent with the CWA. The input received from the public in response to today's ANPRM will be used by the agencies to determine the issues to be addressed and the substantive approach for a future proposed rulemaking addressing the scope of CWA jurisdiction.

Pending this rulemaking, should questions arise, the regulated community should seek assistance from the Corps and EPA, in accordance with the joint memorandum attached as Appendix A.

**DATES:** In order to be considered, comments or information in response to this ANPRM must be postmarked or e-mailed on or before March 3, 2003.

**ADDRESSES:** Comments may be submitted electronically, by mail, or through hand delivery/courier. Mail comments to: Water Docket, Environmental Protection Agency, Mailcode 4101T, 1200 Pennsylvania Ave., NW., Washington, DC 20460, Attention Docket ID No. OW–2002–0050.

**FOR FURTHER INFORMATION CONTACT:** For information on this ANPRM, contact either Donna Downing, U.S. Environmental Protection Agency, Office of Wetlands, Oceans and Watersheds (4502T), 1200 Pennsylvania Avenue N.W., Washington, DC 20460, phone: (202) 566–1366, e-mail: *CWAwaters@epa.gov,* or Ted Rugiel, U.S. Army Corps of Engineers, ATTN CECW–OR, 441 G Street NW., Washington, DC 20314–1000, phone: (202) 761–4595, e-mail: *Thaddeus.J.Rugiel@ HQ02.USACE.ARMY.MIL.*

**SUPPLEMENTARY INFORMATION:**

**I. General Information**

*A. Potentially Regulated Entities*

Persons or entities that discharge pollutants (including dredged or fill material) to "waters of the U.S." could be regulated by a rulemaking based on this ANPRM. The CWA generally prohibits the discharge of pollutants into "waters of the U.S." without a permit issued by EPA or a State or Tribe approved by EPA under section 402 of the Act, or, in the case of dredged or fill material, by the Corps or an approved

State or Tribe under section 404 of the Act. In addition, under the CWA, States or approved Tribes establish water quality standards for "waters of the U.S.", and also may assume responsibility for issuance of CWA permits for discharges into waters and wetlands subject to the Act. Today's ANPRM seeks public input on what, if any, revisions in light of SWANCC might be appropriate to the regulations that define "waters of the U.S.", and today's ANPRM thus would be of interest to all entities discharging to, or regulating, such waters. In addition, because the Oil Pollution Act (OPA) is applicable to waters and wetlands subject to the CWA, today's ANPRM may have implications for persons or entities subject to the OPA. Examples of entities potentially regulated include:

| Category | Examples of potentially regulated entities |
| --- | --- |
| State/Tribal governments or instrumentalities. | State/Tribal agencies or instrumentalities that discharge or spill pollutants into waters of the U.S. |
| Local governments or instrumentalities. | Local governments or instrumentalities that discharge or spill pollutants into waters of the U.S. |
| Federal government agencies or instrumentalities. | Federal government agencies or instrumentalities that discharge or spill pollutants into waters of the U.S. |
| Industrial, commercial, or agricultural entities. | Industrial, commercial, or agricultural entities that discharge or spill pollutants into waters of the U.S. |
| Land developers and landowners. | Land developers and landowners that discharge or spill pollutants into waters of the U.S. |

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities that are likely to be regulated by a rulemaking based on this ANPRM. This table lists the types of entities that we are now aware of that could potentially be regulated. Other types of entities not listed in the table could also be regulated. To determine whether your organization or its activities could be regulated, you should carefully examine the discussion in this ANPRM. If you have questions regarding the applicability of this action to a particular entity, consult one of the persons listed in the preceding **FOR FURTHER INFORMATION CONTACT** section.

*B. How Can I Get Copies of This Document and Other Related Information?*

1. *Docket.* The agencies have established an official public docket for this action under Docket ID No. OW–2002–0050. The official public docket consists of the documents specifically referenced in this ANPRM, any public comments received, and other information related to this ANPRM. Although a part of the official docket, the public docket does not include Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. The official public docket is the collection of materials that is available for public viewing at the Water Docket in the EPA Docket Center, (EPA/DC) EPA West, Room B102, 1301 Constitution Ave., NW., Washington, DC. The EPA Docket Center Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the Water Docket is (202) 566–2426. You may have to pay a reasonable fee for copying.

2. *Electronic Access.* You may access this Federal Register document electronically through the EPA Internet under the Federal Register listings at *http://www.epa.gov/fedrgstr/*.

An electronic version of the public docket is available through EPA's electronic public docket and comment system, EPA Dockets. You may use EPA Dockets at *http://www.epa.gov/edocket* to submit or view public comments, access the index listing of the contents of the official public docket, and to access those documents in the public docket that are available electronically. Once in the system, select search, then key in the appropriate docket identification number.

Certain types of information will not be placed in the EPA Dockets. Information claimed as CBI and other information whose disclosure is restricted by statute, which is not included in the official public docket, will not be available for public viewing in EPA's electronic public docket. EPA's policy is that copyrighted material will not be placed in EPA's electronic public docket but will be available only in printed, paper form in the official public docket. Although not all docket materials may be available electronically, you may still access any of the publicly available docket materials through the docket facility identified in I.B.1.

For those who submit public comments, it is important to note that EPA's policy is that public comments, whether submitted electronically or in paper, will be made available for public viewing in EPA's electronic public docket as EPA receives them and without change, unless the comment contains copyrighted material, CBI, or other information whose disclosure is restricted by statute. When EPA identifies a comment containing copyrighted material, EPA will provide a reference to that material in the version of the comment that is placed in EPA's electronic public docket. The entire printed comment, including the copyrighted material, will be available in the public docket.

Public comments submitted on computer disks that are mailed or delivered to the docket will be transferred to EPA's electronic public docket. Public comments that are mailed or delivered to the Docket will be scanned and placed in EPA's electronic public docket. Where practical, physical objects will be photographed, and the photograph will be placed in EPA's electronic public docket along with a brief description written by the docket staff.

*C. How and To Whom Do I Submit Comments?*

You may submit comments electronically, by mail, or through hand delivery/courier. To ensure proper receipt by EPA, identify the appropriate docket identification number (OW–2002–0050) in the subject line on the first page of your comment. Please ensure that your comments are submitted within the specified comment period. Comments received after the close of the comment period will be marked late. The agencies are not required to consider these late comments.

1. *Electronically.* If you submit an electronic comment as prescribed below, EPA recommends that you include your name, mailing address, and an e-mail address or other contact information in the body of your comment. Also include this contact information on the outside of any disk or CD ROM you submit, and in any cover letter accompanying the disk or CD ROM. This ensures that you can be identified as the submitter of the comment and allows EPA to contact you in case EPA cannot read your comment due to technical difficulties or needs further information on the substance of your comment. EPA's policy is that EPA will not edit your comment, and any identifying or contact information provided in the body of a comment will be included as part of the comment that is placed in the official public docket,

and made available in EPA's electronic public docket. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, the agencies may not be able to consider your comment.

i. *EPA Dockets.* Your use of EPA's electronic public docket to submit comments to EPA electronically is EPA's preferred method for receiving comments. Go directly to EPA Dockets at *http://www.epa.gov/edocket*, and follow the online instructions for submitting comments. Once in the system, select search, and then key in Docket ID No. OW–2002–0050. The system is an anonymous access system, which means EPA will not know your identity, e-mail address, or other contact information unless you provide it in the body of your comment.

ii. *E-mail.* Comments may be sent by electronic mail (e-mail) to *CWAwaters@epa.gov*, Attention Docket ID No. OW–2002–0050. In contrast to EPA's electronic public docket, EPA's e-mail system is not an anonymous access system. If you send an e-mail comment directly to the Docket without going through EPA's electronic public docket, EPA's e-mail system automatically captures your e-mail address. E-mail addresses that are automatically captured by EPA's e-mail system are included as part of the comment that is placed in the official public docket, and made available in EPA's electronic public docket.

iii. *Disk or CD ROM.* You may submit comments on a disk or CD ROM that you mail to the mailing address identified in I.C.2. These electronic submissions will be accepted in WordPerfect or ASCII file format. Avoid the use of special characters and any form of encryption.

2. *By Mail.* Send four copies of your comments to: Water Docket, Environmental Protection Agency, Mailcode 4101T, 1200 Pennsylvania Ave., NW, Washington, DC 20460, Attention Docket ID No. OW–2002–0050.

3. *By Hand Delivery or Courier.* Deliver your comments to: Water Docket, EPA Docket Center, EPA West, Room B102, 1301 Constitution Avenue, NW, Washington, DC, Attention Docket ID No. OW–2002–0050. Such deliveries are only accepted during the Docket's normal hours of operation as identified in I.B.1.

D. *What Should I Consider as I Prepare My Comments?*

You may find the following suggestions helpful for preparing your comments:

a. Explain your views as clearly as possible.
b. Describe any assumptions that you used.
c. Provide any technical information and/or data on which you based your views.
d. If you estimate potential burden or costs, explain how you arrived at your estimate.
e. Provide specific examples to illustrate your concerns.
f. Offer alternatives.
g. Make sure to submit your comments by the comment period deadline identified.
h. To ensure proper receipt by EPA, identify the appropriate docket identification number in the subject line on the first page of your response. It would also be helpful if you provided the name, date, and **Federal Register** citation related to your comments.

II. The Importance of Updating the Regulations

The agencies have not engaged in a review of the regulations with the public concerning CWA jurisdiction for some time. This ANPRM will help ensure that the regulations are consistent with the CWA and the public understands what waters are subject to CWA jurisdiction. The goal of the agencies is to develop proposed regulations that will further the public interest by clarifying what waters are subject to CWA jurisdiction and affording full protection to these waters through an appropriate focus of Federal and State resources consistent with the CWA. It is appropriate to review the regulations to ensure that they are consistent with the *SWANCC* decision. *SWANCC* eliminates CWA jurisdiction over isolated waters that are intrastate and non-navigable, where the sole basis for asserting CWA jurisdiction is the actual or potential use of the waters as habitat for migratory birds that cross State lines in their migrations. *SWANCC* also calls into question whether CWA jurisdiction over isolated, intrastate, non-navigable waters could now be predicated on the other factors listed in the "Migratory Bird Rule" or the other rationales of 33 CFR 328.3(a)(3)(i)–(iii).

Although the *SWANCC* case itself specifically involves section 404 of the CWA, the Court's decision may also affect the scope of regulatory jurisdiction under other provisions of the CWA, including programs under sections 303, 311, 401, and 402. Under each of these sections, the relevant agencies have jurisdiction over "waters of the United States." The agencies will consider the potential implications of the rulemaking for these other sections.

• *Section 404 dredged and fill material permit program.* This program establishes a permitting system to regulate discharges of dredged or fill material into waters of the United States.
• *Section 303 water quality standards program.* Under this program, States and authorized Indian Tribes establish water quality standards for navigable waters to "protect the public health or welfare" and "enhance the quality of water", "taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agriculture, industrial, and other purposes, and also taking into consideration their use and value for navigation."
• *Section 311 spill program and the Oil Pollution Act (OPA).* Section 311 of the CWA addresses pollution from both oil and hazardous substance releases. Together with the Oil Pollution Act, it provides EPA and the U.S. Coast Guard with the authority to establish a program for preventing, preparing for, and responding to spills that occur in navigable waters of the United States.
• *Section 401 State water-quality certification program.* Section 401 provides that no Federal permit or license for activities that might result in a discharge to navigable waters may be issued unless a section 401 water-quality certification is obtained from or waived by States or authorized Tribes.
• *Section 402 National Pollutant Discharge Elimination System (NPDES) permitting program.* This program establishes a permitting system to regulate point source discharges of pollutants (other than dredged or fill material) into waters of the United States.

III. Legislative and Regulatory Context

The Federal Water Pollution Control Act Amendments, now known as the Clean Water Act (CWA), was enacted in 1972. In the years since its enactment, the scope of waters regulated under the CWA has been discussed in regulations, legislation, and judicial decisions.

The CWA was intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. 1251(a). Its specific provisions were designed to improve upon the protection of the Nation's waters provided under earlier statutory schemes such as the Rivers and Harbors Act of 1899 ("RHA") (33 U.S.C. 403, 407, 411) and the Federal Water Pollution Control Act of 1948 (62 Stat. 1155) and its subsequent amendments through 1970. In doing so, Congress recognized "the primary responsibilities and rights of States to prevent, reduce,

and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources * * *" 33 U.S.C. 1251(b).

The jurisdictional scope of the CWA is "navigable waters," defined in the statute as "waters of the United States, including the territorial seas." CWA section 502(7), 33 U.S.C. 1362(7). The existing CWA section 404 regulations define "waters of the United States" as follows:

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to ebb and flow of the tide;

(2) All interstate waters including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

(i) which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) from which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) which are used or could be used for industrial purposes by industries in interstate commerce.

(4) All impoundments of waters otherwise defined as waters of the United States under the definition;

(5) Tributaries of waters identified in paragraphs (a)(1)–(4) of this section;

(6) The territorial seas;

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1)–(6) of this section.

(8) Waters of the United States do not include prior converted cropland ... Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds ...) are not waters of the United States. 40 CFR.230.3(s); 33 CFR 328.3(a).

Counterpart and substantively similar regulatory definitions appear at 40 CFR 110.1, 112.2, 116.3, 117.1, 122.2, 232.2, 300.5, part 300 App. E, 302.3 and 401.11 (hereafter referred to as "the counterpart definitions").

In regulatory preambles, both the Corps and EPA provided examples of additional types of links to interstate commerce which might serve as a basis under 40 CFR 230.3(a)(3) and 33 CFR 328.3(a)(3) for establishing CWA jurisdiction over intrastate waters which were not part of the tributary system or their adjacent wetlands. These included use of waters (1) as habitat by birds protected by Migratory Bird Treaties or which cross State lines, (2) as habitat for endangered species, or (3) to irrigate crops sold in commerce. 51 FR 41217 (November 13, 1986), 53 FR 20765 (June 6, 1988). These examples became known as the "Migratory Bird Rule," even though the examples were neither a rule nor entirely about birds. The Migratory Bird Rule later became the focus of the *SWANCC* case.

### IV. Potential Natural Resource Implications

To date, some quantitative studies and anecdotal data provide early estimates of potential resource implications of the *SWANCC* decision. One of the purposes of the ANPRM is to solicit additional information, data, or studies addressing the extent of resource impacts to isolated, intrastate, non-navigable waters.

Non-navigable intrastate isolated waters occur throughout the country. Their extent depends on a variety of factors including topography, climate, and hydrologic forces. Preliminary assessments of potential resource impacts vary widely depending on the scenarios considered. See, *e.g.*, Ducks Unlimited, "The SWANCC Decision: Implications for Wetlands and Waterfowl" (September 2001) (available at *http://www.ducks.org/conservation/404_report.asp*); ASWM, "SWANCC Decision and the State Regulation of Wetlands," (June 2001) (available at *http://www.aswm.org*).

There is an extensive body of knowledge about the functions and values of wetlands, which include flood risk reduction, water quality improvement, fish and wildlife habitat, and maintenance of the hydrologic integrity of aquatic ecosystems. The ANPRM seeks information regarding the functions and values of wetlands and other waters that may be affected by the issues discussed in this ANPRM.

### V. Solicitation of Comments

The agencies are seeking comment on issues related to the jurisdictional status of isolated waters under the CWA which the public wishes to call to our attention. To assist the public in considering these issues, the following discussion and specific questions are presented. The agencies will carefully consider the responses received to this ANPRM in determining what regulatory changes may be appropriate and the issues to be addressed in a proposed rulemaking to clarify CWA jurisdiction.

The *SWANCC* holding eliminates CWA jurisdiction over isolated, intrastate, non-navigable waters where the sole basis for asserting CWA jurisdiction is the actual or potential use of the waters as habitat for migratory birds that cross State lines in their migrations. 531 U.S. at 174 ("We hold that 33 CFR 328.3(a)(3) (1999), as clarified and applied to petitioner's balefill site pursuant to the "Migratory Bird Rule," 51 FR 41217 (1986), exceeds the authority granted to respondents under section 404(a) of the CWA."). The agencies seek comment on the use of the factors in 33 CFR 328.3(a)(3)(i)–(iii) or the counterpart regulations in determining CWA jurisdiction over isolated, intrastate, non-navigable waters.

The agencies solicit comment from the public on the following issues:

(1) Whether, and, if so, under what circumstances, the factors listed in 33 CFR 328.3(a)(3)(i)–(iii) (*i.e.*, use of the water by interstate or foreign travelers for recreational or other purposes, the presence of fish or shellfish that could be taken and sold in interstate commerce, the use of the water for industrial purposes by industries in interstate commerce) or any other factors provide a basis for determining CWA jurisdiction over isolated, intrastate, non-navigable waters?

(2) Whether the regulations should define "isolated waters," and if so, what factors should be considered in determining whether a water is or is not isolated for jurisdictional purposes?

Solicitation of Information

In answering the questions set forth above, please provide, as appropriate, any information (*e.g.*, scientific and technical studies and data, analysis of environmental impacts, effects on interstate commerce, other impacts, etc.) supporting your views, and specific recommendations on how to implement such views. Additionally, we invite your views as to whether any other revisions are needed to the existing regulations on which waters are jurisdictional under the CWA. As noted elsewhere in this document, the agencies are also soliciting data and information on the availability and effectiveness of other Federal or State programs for the protection of aquatic resources, and on the functions and values of wetlands and other waters that may be affected by the issues discussed in this ANPRM.

### VI. Related Federal and State Authorities

The *SWANCC* decision addresses CWA jurisdiction, and other Federal or

Federal Register/Vol. 68, No. 10/Wednesday, January 15, 2003/Proposed Rules    1995

State laws and programs may still protect a water and related ecosystem even if that water is no longer jurisdictional under the CWA following SWANCC. The Federal government remains committed to wetlands protection through the Food Security Act's Swampbuster requirements and Federal agricultural program benefits and restoration through such Federal programs as the Wetlands Reserve Program (administered by the U.S. Department of Agriculture), grant making programs such as Partners in Wildlife (administered by the Fish and Wildlife Service), the Coastal Wetlands Restoration Program (administered by the National Marine Fisheries Service), the State Grant, Five Star Restoration, and National Estuary Programs (administered by EPA), and the Migratory Bird Conservation Commission (composed of the Secretaries of Interior and Agriculture, the Administrator of EPA and Members of Congress).

The SWANCC decision also highlights the role of States in protecting waters not addressed by Federal law. Prior to SWANCC, fifteen States had programs that addressed isolated wetlands. Since SWANCC, additional States have considered, and two have adopted, legislation to protect isolated waters. The Federal agencies have a number of initiatives to assist States in these efforts to protect wetlands. For example, EPA's Wetland Program Development Grants are available to assist States, Tribes, and local governments for building their wetland program capacities. In addition, the U.S. Department of Justice and other Federal agencies co-sponsored a national wetlands conference with the National Governors Association Center for Best Practices, National Conference of State Legislatures, the Association of State Wetlands Managers, and the National Association of Attorneys General. This conference and the dialogue that has ensued will promote close collaboration between Federal agencies and States in developing, implementing, and enforcing wetlands protection programs. EPA also is providing funding to the National Governors Association Center for Best Practices to assist States in developing appropriate policies and actions to protect intrastate isolated waters.

In light of this, the agencies solicit information and data from the general public, the scientific community, and Federal and State resource agencies on the availability and effectiveness of other Federal or State programs for the protection of aquatic resources and practical experience with their implementation. The agencies are also interested in data and comments from State and local agencies on the effect of no longer asserting jurisdiction over some of the waters (and discharges to those waters) in a watershed on the implementation of Total Maximum Daily Loads (TMDLs) and attainment of water quality standards.

## VII. Statutory and Executive Order Reviews

### A. Executive Order 12866

Under Executive Order 12866 (58 FR 51735, October 4, 1993), EPA and the Corps must determine whether the regulatory action is "significant" and therefore subject to review by the Office of Management and Budget (OMB) and the requirements of the Executive Order. The Order defines "significant regulatory action" as one that is likely to result in a rule that may:

(1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities;

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

Pursuant to the terms of Executive Order 12866, it has been determined that this Advanced Notice of Proposed Rulemaking is a "significant regulatory action" in light of the provisions of paragraph (4) above as it raises novel legal or policy issues. As such, this action was submitted to OMB for review. Changes made in response to OMB suggestions or recommendations will be documented in the public record.

### B. National Environmental Policy Act

As required by the National Environmental Policy Act (NEPA), the Corps prepares appropriate environmental documentation for its activities affecting the quality of the human environment. The Corps has determined that today's Advance Notice of Proposed Rulemaking merely solicits early comment on issues associated with the scope of waters that are properly subject to the CWA, and information or data from the general public, the scientific community, and Federal and State resource agencies on the implications of the SWANCC decision for the protection of aquatic resources. In light of this, the Corps has determined that today's ANPRM does not constitute a major Federal action significantly affecting the quality of the human environment, and thus does not require the preparation of an Environmental Impact Statement (EIS).

Dated: January 10, 2003.
**Christine Todd Whitman,**
*Administrator, Environmental Protection Agency.*

Dated: January 10, 2003.
**R.L. Brownlee,**
*Acting Assistant Secretary of the Army, (Civil Works), Department of the Army.*

Note: The following guidance document will not appear in the Code of Federal Regulations.

## Appendix A

### Joint Memorandum

**Introduction**

This document provides clarifying guidance regarding the Supreme Court's decision in Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers, 531 U.S. 159 (2001) ("SWANCC") and addresses several legal issues concerning Clean Water Act ("CWA") jurisdiction that have arisen since SWANCC in various factual scenarios involving federal regulation of "navigable waters." Because the case law interpreting SWANCC has developed over the last two years, the Agencies are issuing this updated guidance, which supersedes prior guidance on this issue. The Corps and EPA are also initiating a rulemaking process to collect information and to consider jurisdictional issues as set forth in the attached ANPRM. Jurisdictional decisions will be based on Supreme Court cases including United States v. Riverside Bayview Homes, 474 U.S. 121 (1985) and SWANCC, regulations, and applicable case law in each jurisdiction.

**Background**

In SWANCC, the Supreme Court held that the Army Corps of Engineers had exceeded its authority in asserting CWA jurisdiction pursuant to section 404(a) over isolated, intrastate, non-navigable waters under 33 C.F.R. 328.3(a)(3), based on their use as habitat for migratory birds pursuant to preamble language commonly referred to as the "Migratory Bird Rule," 51 FR 41217 (1986). "Navigable waters" are defined in section 502 of the CWA to mean "waters of the United States, including the territorial seas." In SWANCC, the Court determined that the term "navigable" had significance in indicating the authority Congress intended to exercise in asserting CWA jurisdiction. 531 U.S. at 172. After reviewing the jurisdictional scope of the statutory definition of "navigable waters" in section 502, the Court concluded that neither the text of the statute nor its legislative history supported the

**1996**      Federal Register / Vol. 68, No. 10 / Wednesday, January 15, 2003 / Proposed Rules

Corps' assertion of jurisdiction over the waters involved in *SWANCC. Id.* at 170–171.

In *SWANCC,* the Supreme Court recognized that "Congress passed the CWA for the stated purpose of 'restoring and maintaining the chemical, physical, and biological integrity of the Nation's waters'" and also noted that "Congress chose to 'recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources.'" *Id.* at 166–67 (citing 33 U.S.C. 1251(a) and (b)). However, expressing "serious constitutional and federalism questions" raised by the Corps' interpretation of the CWA, the Court stated that "where an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result." *Id.* at 174, 172. Finding "nothing approaching a clear statement from Congress that it intended section 404(a) to reach an abandoned sand and gravel pit" (*id.* at 174), the Court held that the Migratory Bird Rule, as applied to petitioners' property, exceeded the agencies' authority under section 404(a). *Id.* at 174.

### The Scope of CWA Jurisdiction After SWANCC

Because *SWANCC* limited use of 33 CFR § 328.3(a)(3) as a basis of jurisdiction over certain isolated waters, it has focused greater attention on CWA jurisdiction generally, and specifically over tributaries to jurisdictional waters and over wetlands that are "adjacent wetlands" for CWA purposes.

As indicated, section 502 of the CWA defines the term navigable waters to mean "waters of the United States, including the territorial seas." The Supreme Court has recognized that this definition clearly includes those waters that are considered traditional navigable waters. In *SWANCC,* the Court noted that while "the word 'navigable' in the statute was of 'limited import'" (quoting *Riverside,* 474 U.S. 121 (1985)), "the term 'navigable' has at least the import of showing us what Congress had in mind as its authority for enacting the CWA: traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." 531 U.S. at 172. In addition, the Court reiterated in *SWANCC* that Congress evidenced its intent to regulate "at least some waters that would not be deemed 'navigable' under the classical understanding of that term." *SWANCC* at 171 (quoting *Riverside,* 474 U.S. at 133). Relying on that intent, for many years, EPA and the Corps have interpreted their regulations to assert CWA jurisdiction over non-navigable tributaries of navigable waters and their adjacent wetlands. Courts have upheld the view that traditional navigable waters and, generally speaking, their tributary systems (and their adjacent wetlands) remain subject to CWA jurisdiction.

Several federal district and appellate courts have addressed the effect of *SWANCC* on CWA jurisdiction, and the case law on the precise scope of federal CWA jurisdiction in light of *SWANCC* is still developing. While a majority of cases hold that *SWANCC* applies only to waters that are isolated, intrastate and non-navigable, several courts have interpreted *SWANCC*'s reasoning to apply to waters other than the isolated waters at issue in that case. This memorandum attempts to add greater clarity concerning federal CWA jurisdiction following *SWANCC* by identifying specific categories of waters, explaining which categories of waters are jurisdictional or non-jurisdictional, and pointing out where more refined factual and legal analysis will be required to make a jurisdictional determination.

Although the *SWANCC* case itself specifically involved Section 404 of the CWA, the Court's decision may affect the scope of regulatory jurisdiction under other provisions of the CWA as well, including the Section 402 NPDES program, the Section 311 oil spill program, water quality standards under Section 303, and Section 401 water quality certification. Under each of these sections, the relevant agencies have jurisdiction over "waters of the United States." CWA section 502(7).

This memorandum does not discuss the exact factual predicates that are necessary to establish jurisdiction in individual cases. We recognize that the field staff and the public could benefit from additional guidance on how to apply the applicable legal principles to individual cases.[1] Should questions arise concerning CWA jurisdiction, the regulated community should seek assistance from the Corps and EPA.

### A. Isolated, Intrastate Waters That are Non-Navigable

*SWANCC* squarely eliminates CWA jurisdiction over isolated waters that are intrastate and non-navigable, where the sole basis for asserting CWA jurisdiction is the actual or potential use of the waters as habitat for migratory birds that cross state lines in their migrations. 531 U.S. at 174 ("We hold that 33 CFR § 328.3(a)(3) (1999), as clarified and applied to petitioner's balefill site pursuant to the 'Migratory Bird Rule,' 51 FR 41217 (1986), exceeds the authority granted to respondents under § 404(a) of the CWA."). The EPA and the Corps are now precluded from asserting CWA jurisdiction in such situations, including over waters such as isolated, non-navigable, intrastate vernal pools, playa lakes and pocosins. *SWANCC* also calls into question whether CWA jurisdiction over isolated, intrastate, non-navigable waters could now be predicated on the other factors listed in the Migratory Bird Rule, 51 FR 41217 (*i.e.,* use of the water as habitat for birds protected by Migratory Bird Treaties; use of the water as habitat for Federally protected endangered or threatened species; or use of the water to irrigate crops sold in interstate commerce).

By the same token, in light of *SWANCC,* it is uncertain whether there remains any basis for jurisdiction under the other rationales of § 328.3(a)(3)(i)–(iii) over isolated, non-navigable, intrastate waters (*i.e.,* use of the water by interstate or foreign travelers for recreational or other purposes; the presence of fish or shellfish that could be taken and sold in interstate commerce; use of the water for industrial purposes by industries in interstate commerce). Furthermore, within the states comprising the Fourth Circuit, CWA jurisdiction under 33 CFR § 328.3(a)(3) in its entirety has been precluded since 1997 by the Fourth Circuit's ruling in *United States* v. *Wilson,* 133 F. 3d 251, 257 (4th Cir. 1997) (invalidating 33 CFR § 328.3(a)(3)).

In view of *SWANCC,* neither agency will assert CWA jurisdiction over isolated waters that are both intrastate and non-navigable, where the sole basis available for asserting CWA jurisdiction rests on any of the factors listed in the "Migratory Bird Rule." In addition, in view of the uncertainties after *SWANCC* concerning jurisdiction over isolated waters that are both intrastate and non-navigable based on other grounds listed in 33 CFR § 328.3(a)(3)(i)–(iii), field staff should seek formal project-specific Headquarters approval prior to asserting jurisdiction over such waters, including permitting and enforcement actions.

### B. Traditional Navigable Waters

As noted, traditional navigable waters are jurisdictional. Traditional navigable waters are waters that are subject to the ebb and flow of the tide, or waters that are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. 33 CFR § 328.3(a)(1); *United States* v. *Appalachian Elec. Power Co.,* 311 U.S. 377, 407–408 (1940) (water considered navigable, although not navigable at present but could be made navigable with reasonable improvements); *Economy Light & Power Co.* v. *United States,* 256 U.S. 113 (1911) (dams and other structures do not eliminate navigability); *SWANCC,* 531 U.S. at 172 (referring to traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made).[2]

In accord with the analysis in *SWANCC,* waters that fall within the definition of traditional navigable waters remain jurisdictional under the CWA. Thus, isolated, intrastate waters that are capable of supporting navigation by watercraft remain subject to CWA jurisdiction after SWANCC if they are traditional navigable waters, *i.e.,* if they meet any of the tests for being navigable-in-fact. *See, e.g., Colvin* v. *United States* 181 F. Supp. 2d 1050 (C.D. Cal. 2001) (isolated

---

[1] The CWA provisions and regulations described in this document contain legally binding requirements. This document does not substitute for those provisions or regulations, nor is it a regulation itself. It does not impose legally binding requirements on EPA, the Corps, or the regulated community, and may not apply to a particular situation depending on the circumstances. Any decisions regarding a particular water will be based on the applicable statutes, regulations, and case law. Therefore, interested person are free to raise questions and objections about the appropriateness of the application of this guidance to a particular situation, and EPA and/or the Corps will consider whether or not the recommendations or interpretations of this guidance are appropriate in that situation based on the law and regulations.

[2] These traditional navigable waters are not limited to those regulated under Section 10 of the Rivers and Harbors Act of 1899; traditional navigable waters include waters which, although used, susceptibale to use, or historically used, to transport goods or people in commerce, do not form part of a continuous wateborne highway.

man-made water body capable of boating found to be "water of the United States").

C. Adjacent Wetlands

(1) Wetlands Adjacent to Traditional Navigable Waters

CWA jurisdiction also extends to wetlands that are adjacent to traditional navigable waters. The Supreme Court did not disturb its earlier holding in Riverside when it rendered its decision in SWANCC. Riverside dealt with a wetland adjacent to Black Creek, a traditional navigable water. 474 U.S. 121 (1985); see also SWANCC, 531 U.S. at 167 ("[i]n Riverside, we held that the Corps had section 404(a) jurisdiction over wetlands that actually abutted on a navigable waterway"). The Court in Riverside found that "Congress'; concern for the protection of water quality and aquatic ecosystems indicated its intent to regulate wetlands 'inseparably bound up with'" jurisdictional waters. 474 U.S. at 134. Thus, wetlands adjacent to traditional navigable waters clearly remain jurisdictional after SWANCC. The Corps and EPA currently define 'adjacent' as "bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes, and the like are 'adjacent wetlands.'" 33 CFR § 328.3(b); 40 CFR § 230.3(b). The Supreme Court has not itself defined the term "adjacent," nor stated whether the basis for adjacency is geographic proximity or hydrology.

(2) Wetlands Adjacent to Non-Navigable Waters

The reasoning in Riverside, as followed by a number of post-SWANCC courts, supports jurisdiction over wetlands adjacent to non-navigable waters that are tributaries to navigable waters. Since SWANCC, some courts have expressed the view that SWANCC raised questions about adjacency jurisdiction, so that wetlands are jurisdictional only if they are adjacent to navigable waters. See, e.g., Rice v. Harken, discussed infra.

D. Tributaries

A number of court decisions have held that SWANCC does not change the principle that CWA jurisdiction extends to tributaries of navigable waters. See, e.g., Headwaters v. Talent Irrigation Dist., 243 F.3d 526, 534 (9th Cir. 2001) ("Even tributaries that flow intermittently are 'waters of the United States'"); United States v. Interstate Gen. Co, No. 01–4513, slip op. at 7, 2002 WL 1421411 (4th Cir. July 2, 2002), aff'ing 152 F. Supp. 2d 843 (D. Md. 2001) (refusing to grant writ of coram nobis; rejecting argument that SWANCC eliminated jurisdiction over wetlands adjacent to non-navigable tributaries); United States v. Krilich, 393F.3d 784 (7th Cir. 2002) (rejecting motion to vacate consent decree, finding that SWANCC did not alter regulations interpreting "waters of the U.S." other than 33 C.F.R. § 328.3(a)(3)); Community Ass. for Restoration of the Env't v. Henry Bosma Dairy, 305 F.3d 953 (9th Cir. 2002) (drain that flowed into a canal that flows into a river is jurisdictional); Idaho Rural Council v. Bosma, 143 F. Supp. 2d 1169, 1178 (D. Idaho 2001) ("waters of the United States include waters that are tributary to navigable waters"); Aiello v. Town of Brookhaven, 136 F. Supp. 2d 81, 118 (E.D. N.Y. 2001) (non-navigable pond and creek determined to be tributaries of navigable waters, and therefore "waters of the United States under the CWA"). Jurisdiction has been recognized even when the tributaries in question flow for a significant distance before reaching a navigable water or are several times removed from the navigable waters (i.e., "tributaries of tributaries"). See, e.g., United States v. Lamplight Equestrian Ctr., No. 00 C 6486, 2002 WL 360652, at *8 (ND. Ill. Mar. 8, 2002) ("Even where the distance from the tributary to the navigable water is significant, the quality of the tributary is still vital to the quality of navigable waters"); United States v. Buday, 138 F. Supp. 2d 1282, 1291–92 (D. Mont. 2001) ("water quality of tributaries * * * distant though the tributaries may be from navigable streams, is vital to the quality of navigable waters"); United States v. Rueth Dev. Co., No. 2:96CV540, 2001 WL 17580078 (N.D. Ind. Sept. 26, 2001) (refusing to reopen a consent decree in a CWA case and determining that jurisdiction remained over wetlands adjacent to a non-navigable (man-made) waterway that flows into a navigable water).

Some courts have interpreted the reasoning in SWANCC to potentially circumscribe CWA jurisdiction over tributaries by finding CWA jurisdiction attaches only where navigable waters and waters immediately adjacent to navigable waters are involved. Rice v. Harken is the leading case taking the narrowest view of CWA jurisdiction after SWANCC. 250 F.3d 264 (5th Cir. 2001) (rehearing denied). Harken interpreted the scope of "navigable waters" under the Oil Pollution Act (OPA). The Fifth Circuit relied on SWANCC to conclude "it appears that a body of water is subject to regulation under the CWA if the body of water is actually navigable or is adjacent to an open body of navigable water." 250 F.3d at 269. The analysis in Harken implies that the Fifth Circuit might limit CWA jurisdiction to only those tributaries that are traditionally navigable or immediately adjacent to a navigable water.

A few post-SWANCC district court opinions have relied on Harken or reasoning similar to that employed by the Harken court to limit jurisdiction. See, e.g., United States v. Rapanos, 190 F. Supp. 2d 1011(E.D. Mich. 2002) (government appeal pending) ("the Court finds as a matter of law that the wetlands on Defendant's property were not directly adjacent to navigable waters, and therefore, the government cannot regulate Defendant's property."); United States v. Needham, No. 6:01–CV–01897, 2002 WL 1162790 (W.D. La. Jan. 23, 2002) (government appeal pending) (district court affirmed finding of no liability by bankruptcy court for debtors under OPA for discharge of oil since drainage ditch into which oil was discharged was found to be neither a navigable water nor adjacent to an open body of navigable water). See also United States v. Newdunn, 195 F. Supp. 2d 751 (E.D. Va. 2002) (government appeal pending) (wetlands and tributaries not contiguous or adjacent to navigable waters are outside CWA jurisdiction); United States v. RGM Corp., 222 F. Supp. 2d 780 (E.D. Va. 2002) (government appeal pending) (wetlands on property not contiguous to navigable river and, thus, jurisdiction not established based upon adjacency to navigable water).

Another question that has arisen is whether CWA jurisdiction is affected when a surface tributary to jurisdictional waters flows for some of its length through ditches, culverts, pipes, storm sewers, or similar manmade conveyances. A number of courts have held that waters with manmade features are jurisdictional. For example, in Headwaters Inc. v. Talent Irrigation District, the Ninth Circuit held that manmade irrigation canals that diverted water from one set of natural streams and lakes to other streams and creeks were connected as tributaries to waters of the United States, and consequently fell within the purview of CWA jurisdiction. 243 F.3d at 533–34. However, some courts have taken a different view of the circumstances under which man-made conveyances satisfy the requirements for CWA jurisdiction. See, e.g., Newdunn, 195 F. Supp. 2d at 765 (government appeal pending) (court determined that Corps had failed to carry its burden of establishing CWA jurisdiction over wetlands from which surface water had to pass through a spur ditch, a series of man-made ditches and culverts as well as non-navigable portions of a creek before finally reaching navigable waters).

A number of courts have held that waters connected to traditional navigable waters only intermittently or ephemerally are subject to CWA jurisdiction. The language and reasoning in the Ninth Circuit's decision in Headwaters Inc. v. Talent Irrigation District indicates that the intermittent flow of waters does not affect CWA jurisdiction. 243 F.3d at 534 ("Even tributaries that flow intermittently are 'waters of the United States.'"). Other cases, however, have suggested that SWANCC eliminated from CWA jurisdiction some waters that flow only intermittently. See, e.g., Newdunn, 195 F. Supp. 2d at 764, 767–68 (government appeal pending) (ditches and culverts with intermittent flow not jurisdictional).

A factor in determining jurisdiction over waters with intermittent flows is the presence or absence of an ordinary high water mark (OHWM). Corps regulations provide that, in the absence of adjacent wetlands, the lateral limits of non-tidal waters extend to the OHWM (33 CFR 328.4(c)(1)). One court has interpreted this regulation to require the presence of a continuous OHWM. United States v. RGM, 222 F. Supp. 2d 780 (E.D. Va. 2002) (government appeal pending).

Conclusion

In light of SWANCC, field staff should not assert CWA jurisdiction over isolated waters that are both intrastate and non-navigable, where the sole basis available for asserting CWA jurisdiction rests on any of the factors listed in the "Migratory Bird Rule." In addition, field staff should seek formal project-specific HQ approval prior to asserting jurisdiction over waters based on

other factors listed in 33 CFR 328.3(a)(3)(i)–(iii).

Field staff should continue to assert jurisdiction over traditional navigable waters (and adjacent wetlands) and, generally speaking, their tributary systems (and adjacent wetlands). Field staff should make jurisdictional and permitting decisions on a case-by-case basis considering this guidance, applicable regulations, and any additional relevant court decisions. Where questions remain, the regulated community should seek assistance from the agencies on questions of jurisdiction.

**Robert E. Fabricant,**
*General Counsel, Environmental Protection Agency.*

**Steven J. Morello,**
*General Counsel, Department of the Army.*

[FR Doc. 03–960 Filed 1–14–03; 8:45 am]
**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 52**

[IN140–1b; FRL–7433–6]

### Approval and Promulgation of Implementation Plans; Indiana

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The EPA is proposing to conditionally approve rules submitted by the State of Indiana as revisions to its State Implementation Plan(SIP) for prevention of significant deterioration (PSD) provisions for attainment areas for the Indiana Department of Environmental Management.

In the "Rules and Regulations" section of this **Federal Register**, EPA is approving the State's request as a direct final rule without prior proposal because EPA views this action as noncontroversial and anticipates no adverse comments. The rationale for approval is set forth in the direct final rule. If EPA receives no written adverse comments, EPA will take no further action on this proposed rule. If EPA receives written adverse comment, we will publish a timely withdrawal of the direct final rule in the **Federal Register** and inform the public that the rule will not take effect. In that event, EPA will address all relevant public comments in a subsequent final rule based on this proposed rule. In either event, EPA will not institute a second comment period on this action. Any parties interested in commenting must do so at this time.

**DATES:** Comments on this action must be received by February 14, 2003.

**ADDRESSES:** Written comments should be sent to: Pamela Blakley, Chief, Permits and Grants Section (IL/IN/OH), Air Programs Branch (AR–18J), U.S. Environmental Protection Agency, Region 5, 77 West Jackson Boulevard, Chicago, Illinois 60604.

A copy of the State's request is available for inspection at the above address.

**FOR FURTHER INFORMATION CONTACT:** Julie Capasso, Environmental Scientist, Permits and Grants Section (IL/IN/OH), Air Programs Branch, (AR–18J), U.S. Environmental Protection Agency, Region 5, 77 West Jackson Boulevard, Chicago, Illinois 60604, telephone (312) 886–1426.

**SUPPLEMENTARY INFORMATION:**
Throughout this document whenever "we," "us," or "our" are used we mean the EPA.

I. What action is EPA taking today?
II. Where can I find more information about this proposal and corresponding direct final rule?

### I. What Action Is EPA Taking Today?

The EPA is proposing to conditionally approve rules submitted by the State of Indiana as revisions to its State Implementation Plan (SIP) for prevention of significant deterioration (PSD) provisions for attainment areas for the Indiana Department of Environmental Management.

### II. Where Can I Find More Information About This Proposal and Corresponding Direct Final Rule?

For additional information see the direct final rule published in the rules and regulations section of this **Federal Register**.

Authority: 42 U.S.C. 4201 *et seq.*

Dated: December 18, 2002.

**Bharat Mathur,**
*Acting Regional Administrator, Region 5.*
[FR Doc. 03–617 Filed 1–14–03; 8:45 am]
**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 52**

[MD137–3090b; FRL–7420–9]

### Approval and Promulgation of Air Quality Implementation Plans; Maryland; Revision to the Control of Volatile Organic Compound Emissions From Screen Printing and Digital Imaging

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** EPA proposes to approve the State Implementation Plan (SIP) revision submitted by the State of Maryland establishing reasonable available control technology (RACT) to limit volatile organic compound (VOC) emissions from an overprint varnish that is used in the cosmetic industry. This action also proposes to add new definitions and amend certain existing definitions for terms used in the regulations. In the Final Rules section of this **Federal Register**, EPA is approving the State's SIP submittal as a direct final rule without prior proposal because the Agency views this as a noncontroversial submittal and anticipates no adverse comments. A more detailed description of the state submittal and EPA's evaluation are included in a Technical Support Document (TSD) prepared in support of this rulemaking action. A copy of the TSD is available, upon request, from the EPA Regional Office listed in the **ADDRESSES** section of this document. If no adverse comments are received in response to this action, no further activity is contemplated. If EPA receives adverse comments, the direct final rule will be withdrawn and all public comments received will be addressed in a subsequent final rule based on this proposed rule. EPA will not institute a second comment period. Any parties interested in commenting on this action should do so at this time.

**DATES:** Comments must be received in writing by February 14, 2003.

**ADDRESSES:** Written comments should be addressed to Walter Wilkie, Acting Branch Chief, Air Quality Planning and Information Services Branch, Mailcode 3AP21, U.S. Environmental Protection Agency, Region III, 1650 Arch Street, Philadelphia, Pennsylvania 19103. Copies of the documents relevant to this action are available for public inspection during normal business hours at the Air Protection Division, U.S. Environmental Protection Agency, Region III, 1650 Arch Street, Philadelphia, Pennsylvania 19103; and the Maryland Department of the Environment, 1800 Washington Boulevard, Suite 705, Baltimore, Maryland 21230.

**FOR FURTHER INFORMATION CONTACT:**
Ellen Wentworth, (215) 814–2034, at the EPA Region III address above, or by e-mail at *wentworth.ellen@epa.gov*. Please note that while questions may be posed via telephone and e-mail, formal comments must be submitted in writing, as indicated in the **ADDRESSES** section of this document.

ATTACHMENT B

To Plaintiffs' Opposition to Defendants' Motion to Dismiss

Case No. 1:05CV01579 (RBW)



**US Army Corps of Engineers®**

David Hewitt
(202) 761-0289
david.w.hewitt@usace.army.mil

http://www.usace.army.mil/

# NEWS RELEASE
**For Immediate Release**

**Dec. 16, 2003**



Cathy Milbourn
202-564-7824
milbourn.cathy@epa.gov
Website: http://www.epa.gov/

## EPA, Corps of Engineers Issue Wetlands Decision

The Environmental Protection Agency (EPA) and the Army Corps of Engineers (Corps) today reiterated the Administration's commitment to the goal of "no net loss" of wetlands in the United States. EPA and the Corps announced that they would not issue a new rule on federal regulatory jurisdiction over isolated wetlands.

"Today we are reaffirming and bolstering protections for wetlands, which are vital for water quality, the health of our streams and wildlife habitat," said EPA Administrator Mike Leavitt.

Assistant Secretary of the Army John Paul Woodley Jr. added, "We will continue our efforts to ensure that the Corps' regulatory program is as effective, efficient and responsive as it can be."

The Supreme Court's 2001 decision in the case of Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers (commonly referred to as to "SWANCC") overturned the Corps' assertion of federal jurisdiction over certain isolated wetlands based on the presence of migratory birds. EPA and the Corps responded by issuing revised guidance to their field offices. At the same time, the Agencies reaffirmed federal jurisdiction over the majority of wetlands not impacted by the decision.

After soliciting public comment to determine if further regulatory clarification was needed, the EPA and the Corps have decided to preserve the federal government's authority to protect our wetlands. The agencies will continue to monitor implementation of this important program to ensure its effectiveness.

The Administration is currently implementing dozens of programs to protect and restore millions of acres of our Nation's wetlands. These include the Food Security Act's "Swampbuster" requirements and the Wetlands Reserve Program, both under the authority of the U.S. Department of Agriculture. EPA programs include its "Five-Star Restoration" grant program, the EPA wetlands grants programs and the National Estuary Program. Other federal programs include: the Fish and Wildlife Service's "Partners in Wildlife" program, the National Marine Fisheries Service's Coastal Wetlands Restoration Program and the Migratory Bird Conservation Commission, composed of the Secretaries of Interior and Agriculture, the Administrator of EPA, and Members of Congress.

For information on wetlands regulation, interested persons may contact the Corps' Regulatory Branch website at http://www.usace.army.mil/inet/functions/cw/cecwo/reg/.

-30-